IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| BRANDEIS LOFTS, L.L.C., | ) | |
| | ) | CASE NO. BK07-80482-TLS |
| Debtor(s). | ) | A07-8048-TLS |
| THE WEITZ COMPANY, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | CH. 7 |
| | ) | |
| vs. | ) | |
| | ) | |
| GREAT WESTERN BANK OF | ) | |
| OMAHA, NEBRASKA, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

      This matter is before the court on Great Western Bank's motion for summary judgment (Fil. #41) and resistance by The Weitz Company (Fil. #53). James B. Cavanagh and William G. Garbina represent The Weitz Company, and John A. Sharp and T. Randall Wright represent Great Western Bank. Evidence and briefs were filed and, pursuant to the court's authority under Nebraska Rule of Bankruptcy Procedure 7056-1, the motion was taken under advisement without oral arguments.

      The motion is denied.

      The parties here were involved in a project to develop condominium units and retail space in a former department store building in downtown Omaha, Nebraska. Brandeis Lofts, L.L.C., the debtor, was the project's owner and developer and obtained acquisition financing – and later a construction line of credit – from Great Western Bank ("GWB"). The Weitz Company was hired as the project's general contractor in May 2005 and began work on the project. By July 2006, the debtor was unable to make progress payments to Weitz or the subcontractors. To keep the project going, Weitz alleges, GWB promised to arrange for Weitz to be paid through loans to the debtor, use of the condominium sales proceeds, and tax increment financing. Weitz alleges that it relied on GWB's representations and continued working on the project, only to learn in late December 2006 that neither the debtor nor GWB would pay the promissory note to Weitz coming due at that time. Weitz and the subcontractors then filed construction liens on the project in early January 2007. GWB ultimately scheduled a foreclosure sale of the property, but the Douglas County District Court issued a temporary restraining order to halt the sale. The debtor filed its Chapter 11 bankruptcy petition shortly thereafter. The debtor sold substantially all of its assets in January 2008, and the case was converted to a Chapter 7 in September 2008 on the motion of the United States Trustee. The parties agreed that the sale proceeds received by GWB are subject to Weitz's lien rights as determined in this adversary proceeding.

Weitz filed this adversary proceeding against GWB seeking to have the bank's lien equitably subordinated to the construction lien rights held by Weitz and the subcontractors. Weitz also argues that GWB should be estopped by its conduct and representations from claiming any lien priority over the contractor's and subcontractors' equitable lien. Finally, Weitz requests that a constructive trust be imposed on the project and the sale proceeds for the benefit of Weitz and the subcontractors.

GWB has now filed a motion for summary judgment on all of Weitz's claims, asserting that Weitz's reliance on oral promises by bank personnel is unenforceable and that Weitz cannot establish reasonable and detrimental reliance sufficient to support equitable modification of the parties' rights, because Weitz's position actually improved as a result of payments received after July 2006.

Summary judgment is appropriate only if the record, when viewed in the light most favorable to the non-moving party, shows there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c) (made applicable to adversary proceedings in bankruptcy by Fed. R. Bankr. P. 7056); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). An issue is genuine if it has a real basis in the record, and a genuine issue of fact is material if it might affect the outcome of the suit. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Blocker v. Patch (In re Patch)*, 526 F.3d 1176, 1180 (8th Cir. 2008) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the party opposing the motion and give that party the benefit of all reasonable inferences to be drawn from the record, without resorting to speculation. *Hitt v. Harsco Corp.*, 356 F.3d 920, 923-34 (8th Cir. 2004).

The parties agree on the following facts, at least for purposes of this summary judgment motion:[1]

1. Weitz personnel involved in the project included, among others, project manager Charles "Chuck" Miske and Weitz Group president Radd Way.

2. Brandeis Lofts and Weitz executed the construction contract in May 2005. Way signed the contract on Weitz's behalf.

3. To address the situation of late payment on Weitz's October and November 2005 pay applications, Way met in Lincoln, Nebraska, on Thursday, December 22, 2005, with representatives of Brandeis Lofts. The meeting occurred because of concerns about

---

[1] Numerous additional facts that give a more complete picture of the parties' interactions were included in the submitted materials. However, the facts listed here represent the only ones on which clear consensus was reached.

the financial ability of Brandeis Lofts' ownership to meet payment obligations to Weitz.

4. Way sent an email on December 23, 2005, summarizing the meeting. That email also listed a series of possible options to secure future financing, including approaching large subcontractors to carry payments, approaching a division of Weitz known as Capital Resources Group, and Brandeis Lofts' principal Bob Hampton's pursuit of additional financing using tax increment financing ("TIF") as collateral. On these issues, Way's email stated the following: "If all of this works, using Chuck's revised cash flow of 12/22/05, and more assumptions than we care to admit, the financing gap at June '06 is still + $1 million. TIF loan/additional investor equity/CRG involvement/earlier unit closings all potentials to cover this shortfall."

5. Around February 6, 2006, GWB issued a loan commitment letter, and Brandeis Lofts then sent a letter authorizing "Weitz Company to proceed with construction of the Brandeis Building Condominium and Improvements as described in the Construction Closure Document . . . and per the terms as described in the Contract Agreement dated May 25, 2005." The letter stated financing was "subject to meeting all of the requirements contained [in the loan commitment]." It further stated as follows:

> Cash flow projections indicate a short fall of cash available in June 2006 of $1,100,000 from construction loan proceeds for which arrangements will be made by May 1, 2006 and communicated to Weitz Construction. This short fall will be funded by further arrangements as follows: (1) capital contributions by the partners, or (2) loans from the partners, or (3) with Great Western Bank (through TIF loan proceeds or other financing arrangements). Item #3 relating to Great Western Bank in no way represents that a commitment has been made at the date of this notice or is a guarantee that such financing will occur in the future.

6. On March 31, 2006, Brandeis Lofts finally closed on construction financing via a revolving credit facility from GWB.

7. Miske and Brandeis Lofts' project manager, Don Mohlman, agreed in late May 2006 that an alternative schedule and course of action was necessary in order to keep the project under financial control.

8. On July 28, 2006, Miske, Weitz's project manager, was advised in a telephone call from Gordon Harnisch, GWB loan officer, that the June 2006 pay application would not be paid in full. Weitz was paid only $600,000.00 on its June pay application. Harnisch had not spoken to Miske prior to the discussion about a shortage on the June pay application.

9. In order for Brandeis Lofts to obtain funds from another lender on the TIF loan, it needed a release of the TIF documents from GWB. GWB required payment of several million dollars or certain credit enhancements in order to release the TIF loan.

10. By August 2006, Weitz was owed approximately $3.2 million, consisting of its unpaid June and July invoices ($2.2 million) plus contract retainage totaling approximately $1 million.

11. A meeting was held between representatives of GWB and Brandeis Lofts on August 3, 2006. During the meeting, a call was placed to Miske and he was requested to come to the meeting, which he did. During the course of the meeting, Brabec requested that he and Miske talk separately in an adjacent office. During this discussion, Brabec indicated to Miske that GWB was not confident in Hampton, but was very confident in the new management that was taking over the project. Brabec stated that "Weitz really needed to stay part of the project" and "the bank wanted (Weitz's) commitment that (Weitz) would stay part of the project."

12. On August 21, 2006, Harnisch prepared a memo which noted there were certain amenities which needed to be completed as a priority in the project, including the atrium and basement parking. This was necessary in order to continue sales.

13. On August 25, 2006, Brabec issued an email as to how the structure could proceed and be acceptable to the bank. In the memo Brabec advised that it would be acceptable to pay Weitz a "total of $1.55MM... [T]hen Weitz stands by on Seven Hundred Fifty Thousand Dollars of amount that is due. . . .What Weitz wants to know is how they get paid out of the $750M. Obviously, BL (Brandeis) is holding back $750M from Weitz of which $s will either need to be escrow or paid against our debt."

14. As of August 28, 2006, there was no lender interested in doing the TIF loan.

15. On August 28, 2006, Brabec telephoned Way to discuss the project. According to notes taken by Way, Brabec indicated that he was encouraged with Breck Collingsworth and Steve Borgmann as new management and that Bruce Hocking was representing Hampton. They were bringing new capital to the project and Weitz would be paid $1,500,00.00. The bank was concerned that it "doesn't want to lose sales" and would have to foreclose if any liens were filed.

16. Hampton injected $2.2 million of new capital into the project.

17. As of August 28, 2006, Miske was aware that Brandeis Lofts was requesting Weitz to accept a $750,000.00 promissory note as partial payment of sums due. Miske believed Brandeis Lofts would be able to pay the note when it came due in December

       2006. Indeed, as of August 28, 2006, Miske believed cash flows from the project would be sufficient to allow the note to be retired in a timely fashion.

18. Way claims he was then contacted by GWB's area president Dan Brabec, and that the two met at Way's office in Overland Park, Kansas, on August 31, 2006.

19. Brabec did not advise Way on August 31, 2006, that the TIF financing was not in place or that no bank had actually agreed to fund the TIF financing.

20. On September 7, 2006, Brandeis Lofts executed a $750,000.00 promissory note in favor of Weitz, agreeing to pay the principal sum, plus interest, by December 31, 2006. The $2,200,000.00 cash injection was received by GWB and Weitz was paid approximately $1,550,000.00.

21. The promissory note does not mention GWB, is not acknowledged by GWB, and does not include an addendum acknowledged by GWB. There are no drafts of such documents, nor is there any associated written guarantee of the promissory note or draft of the same for signature by anyone.

22. In September 2006, the Brandeis Lofts loan was placed on GWB's watch list as a problem loan. The decision to place the loan on the watch list occurred in August.

23. Brabec met with Bob Horak of First National Bank to discuss potential TIF financing. They met one time. This meeting occurred in October or November of 2006. Information was provided by GWB to First National regarding the TIF funding on or about November 8, 2006.

24. From September 7, 2006, through December 2006, Weitz and its subcontractors performed the work that was requested by Brandeis Lofts and its project manager. They were paid in full for the work performed during that time period.

25. The promissory note came due on December 31, 2006. Way had a conversation with Brabec on December 20, 2006, regarding the note in which Brabec advised that GWB would not be funding payment of the $750,000.00 note.

26. On December 29, 2006, GWB filed a notice of default with the Douglas County Register of Deeds and thereafter instituted foreclosure proceedings.

27. Weitz filed a construction lien on January 4, 2007, in the total amount of $1,909,274.00.

28. Brandeis Lofts filed for Chapter 11 on March 14, 2007, and Weitz brought this adversary proceeding on June 8, 2007.

29. The various loans by GWB to Brandeis Lofts were secured by collateral including a first deed of trust, an assignment of rents, an assignment of sale proceeds and letters of credit totaling $3,000,000.00.

30. The $750,000.00 note is included within the amounts requested by Weitz and subject to the construction lien against the project and ultimately the lien on the sale proceeds from the sale of the property.

Weitz's first claim for relief is equitable subordination. The purpose of equitable subordination is to "undo or offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Bunch v. J.M. Capital Fin., Ltd. (In re Hoffinger Indus., Inc.)*, 327 B.R. 389, 415 (Bankr. E.D. Ark. 2005) (quoting *Bostian v. Schapiro (In re Kansas City Journal-Post Co.)*, 144 F.2d 791, 800 (8th Cir. 1944)). The court's power to exercise equitable subordination is limited; it is "not authorized in the name of equity to make wholesale substitution of underlying law controlling the validity of creditors' entitlements, but [is] limited to what the Bankruptcy Code itself provides.*" Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 24-25 (2000).

Equitable subordination of one claim in favor of another under 11 U.S.C. § 510(c) generally requires (1) some inequitable conduct by the claimant; (2) resulting in injury to other creditors or conferring an unfair advantage on the claimant; and (3) an outcome from the subordination that is not inconsistent with other provisions of the Bankruptcy Code. *Contractors, Laborers, Teamsters & Eng'rs Health & Welfare Plan v. M & S Grading, Inc. (In re M & S Grading, Inc.)*, 541 F.3d 859, 866 (8th Cir. 2008); *Bergquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 850 F.2d 1275, 1282 (8th Cir. 1988). First, there has to be some showing of inequitable conduct. The Eighth Circuit Court of Appeals recently reiterated this in *Kaler v. Bala (In re Racing Servs., Inc.)*, ___ B.R. ___, Case No. 08-6027 (8th Cir. July 2, 2009):

> [Section] 510(c)(1) of the Bankruptcy Code authorizes the bankruptcy court to subordinate an allowed administrative claim to other claims "under principles of equitable subordination." Equitable subordination requires proof of inequitable conduct by the claimant that injured other creditors or conferred an unfair advantage. *In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1282 (8th Cir. 1988). Fraud, illegality, and breach of fiduciary duty are misconduct that justifies equitable subordination. *See id.* at 1282 & n.13; *In re Missionary Baptist Found. of Am., Inc.*, 712 F.2d 206, 212 (5th Cir. 1983).

*Id.* at *2.

"Inequitable conduct has been regarded as a wrong or unfairness or, 'at the very least, a masquerade of something for what it is not.'" *Jacoway v. Dept. of Treasury-IRS (In re Graycarr, Inc.)*, 330 B.R. 741, 749 (Bankr. W.D. Ark. 2005) (quoting *In re Lifschultz Fast Freight*, 132 F.3d 339, 344 (7th Cir. 1997)). Weitz asserts that GWB made representations which it knew to be unfounded to Weitz to persuade Weitz to stay on the job. In particular, Weitz says GWB assured it

that GWB would provide the money to pay the $750,000.00 note when it came due and that funding for a TIF loan was forthcoming and would be available to finance the project. Weitz relied on these representations in agreeing to accept the promissory note as part of the incentive to come back to the project.

As to the second prong of the test, an unfair advantage to the defendant is as actionable as an injury to the plaintiff. Courts have noted that a third party which has control over the debtor may be subject to equitable subordination if it acts to the disadvantage of creditors. *Holt v. FDIC (In re CTS Truss, Inc.)*, 868 F.2d 146, 148 n.5 (5th Cir. 1989). "Both injury and unfair advantage may be established by proving that a specific creditor was deceived or lured into extending additional credit to the bankrupt." *Summit Coffee Co. v. Herby's Foods, Inc. (In re Herby's Foods, Inc.)*, 2 F.3d 128, 133 (5th Cir. 1993). Weitz argues that its work, relying on GWB's alleged promises of payment, enabled GWB to reap the financial benefits of selling four condominium units that were completed due to Weitz's efforts. As a result, the Brandeis Lofts note was paid down, to the bank's benefit and Weitz's alleged detriment. GWB argues that there was no detriment to Weitz or unfair advantage to GWB since Weitz was paid for all work performed after the promissory note was executed by Brandeis.

A finding that equitable subordination is appropriate requires a factual inquiry. The principles of equitable subordination adopted in § 510 permit the court "to make exceptions to a general rule *when justified by particular facts*." *United States v. Noland*, 517 U.S. 535, 540 (1996) (emphasis added). In the present case, factual disputes exist as to whether GWB engaged in inequitable conduct, including the scope of the representations made to Weitz by GWB personnel and whether those representations were made with the intention of persuading Weitz to rely on the representations and remain on the project. Intent is a factual issue which is not readily resolved on summary judgment. Factual disputes also exist as to whether Weitz was injured by any conduct of GWB or whether GWB enjoyed an "unfair" advantage as a result of its conduct. The parties' competing interpretations of the facts indicate a genuine dispute as to material facts which precludes the entry of summary judgment.

Next, Weitz bases the second count of its complaint on promissory estoppel. However, it seems that Weitz is not asserting a separate cause of action based on promissory estoppel, but is just using it as a basis for its claim for equitable subordination. In its brief, Weitz said: "Weitz has not, and does not, seek recovery based upon an oral promise of the Bank to pay obligations of Brandeis Lofts, L.L.C. . . . Rather, Weitz seeks to subordinate a portion of the first priority construction lien held by the Bank[.]" B.R. in Opp'n to Mot. for Summ. J., at 2 (Fil. #58). In fact, the prayer of the second cause of action in the complaint simply asks that GWB be estopped from claiming priority of its lien over the claims of Weitz. Thus, it seems Weitz is not asserting a separate cause of action based on promissory estoppel.

In any event, if Weitz is asserting a separate cause of action based on promissory estoppel, summary judgment is not appropriate. "Under the doctrine of promissory estoppel, a promise which the promisor should reasonably expect to induce action or forbearance is binding if injustice can be avoided only by enforcement of the promise. Promissory estoppel requires that reliance be reasonable and foreseeable." *Cass County Bank v. Dana P'ship*, 750 N.W.2d 701, 708 (Neb. 2008)

(footnotes omitted). GWB argues in response that the statute of frauds precludes Weitz's ability to use promissory estoppel to enforce an oral promise. *Farmland Serv. Coop., Inc. v. Klein*, 244 N.W.2d 86 (Neb. 1976). However, the statute of frauds does not bar a claim of promissory estoppel in a situation where a contract never arose. *Rosnick v. Dinsmore*, 457 N.W.2d 793 (Neb. 1990) (holding that the creditor lender-investor made a unilateral promise, bargaining for the company's expansion and a resulting return on his investment rather than for any contributions from the company's owner and president). *See Fortress Sys., L.L.C. v. Bank of the West*, 559 F.3d 848 (8th Cir. 2009) (distinguishing *Rosnick* from *Farmland*). In the present case, GWB allegedly led Weitz to believe that GWB would provide or arrange financing for the debtor that would allow Weitz to be paid, and Weitz relied on those alleged assurances in deciding to continue working on the project. The alleged promises and the reasonableness of Weitz's reliance thereon are issues of fact which prevent entry of summary judgment on this claim for relief.

Lastly, Weitz argues that a constructive trust in Weitz's favor should be imposed on the sale proceeds because of the bank's misrepresentations.

> "A constructive trust is a relationship, with respect to property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the ground that his acquisition or retention of the property would constitute unjust enrichment." *Knoell v. Huff*, 224 Neb. 90, 395 N.W.2d 749, 755 (1986). Courts impose a constructive trust when one party has acquired property "under such circumstances that he or she may not in good conscience retain the beneficial interest in the property. In such a situation, equity converts the legal titleholder into a trustee holding the title for the benefit of those entitled to the ownership thereof." *Gottsch v. Bank of Stapleton*, 235 Neb. 816, 458 N.W.2d 443, 450 (1990) (internal quotation omitted). In general, courts will not impose a constructive trust unless the title-holder obtained title by "fraud, misrepresentation, or an abuse of an influential or confidential relationship." *Balfany v. Balfany*, 239 Neb. 391, 476 N.W.2d 681, 684 (1991) (internal quotation omitted).

*Lange v. Schropp (In re Brook Valley VII Joint Venture)*, 496 F.3d 892, 901-02 (8th Cir. 2007).

This requires a factual finding of fraud, misrepresentation, or abuse of a special relationship, which cannot be made on the record currently before the court. Therefore, summary judgment will be denied on this claim for relief.

IT IS ORDERED: Great Western Bank's motion for summary judgment (Fil. #41) is denied.

DATED: July 21, 2009.

BY THE COURT:

/s/ Thomas L. Saladino
Chief Judge

Notice given by the Court to:
    James B. Cavanagh
    William G. Garbina
    *John A. Sharp
    T. Randall Wright
    U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.